**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **SUE MANAWAY,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 1:09-CV-356** |
| | § | |
| **THE MEDICALCENTER OF SE TEXAS,** | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION ON MOTION FOR SUMMARY JUDGMENT

Pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, the Local Rules of The United States District Court for the Eastern District of Texas, Appendix B, and order of the District Court, this matter is before the undersigned United States Magistrate Judge, at Beaumont, Texas, for all proceedings and entry of judgment in accordance with the consent of the parties. Pending before the Court is The Medical Center of Southeast Texas' *Defendant's Motion for Summary Judgment* [Clerk's doc. #23] and *Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* [Clerk's doc. #24]. The Court previously granted the motion for summary judgment by short order, with a memorandum opinion to follow [Clerk's doc. #39]. After careful consideration, this Court now issues this *Memorandum Opinion on Motion for Summary Judgment*.

### Factual Background

Plaintiff Sue Manaway, a fifty-eight (58) year old African-American female, was employed as a charge nurse by Defendant Medical Center of Southeast Texas in its Telemetry Unit. She held the position of charge nurse throughout a substantial portion of her long career with the Medical Center. The charge nurse is primarily responsible for coordinating assignments among the staff

nurses who care directly for the patients and works with doctors, patients, and other departments to coordinate patient care. He or she typically assigns patients among the staff nurses and has overall responsibility for the patients on the floor. The charge nurses usually do not have patients assigned to them. According to Manaway, she was a good, loyal and conscientious charge nurse. A review of the record indicates that she previously received satisfactory evaluations from her supervisors.[1]

Sometime in late 2006, Shannon Smith became Director of the Telemetry Unit and Manaway's immediate supervisor. According to Manaway, she (Manaway) began to notice a difference in the treatment of white versus African-American employees. Manaway specifically noticed that the Medical Center began hiring younger, white nurses. These nurses included Marva Roan, Amber Pattarozzi, Stephanie Pitts, and Tiffany Guillory.[2]

In approximately June 2007, Smith implemented a scheduling plan whereby the staff nurses and Manaway would begin rotating charge nurse duties rather than having one nurse permanently assigned to the charge nurse position.[3] According to Smith, she made the change because she recognized that if a charge nurse requested time off or called in sick, she would not have a nurse trained to fill in for that position and would have to do so herself or use the services of an agency nurse. Smith testified that Manaway, after discovering the change in the schedule, telephoned Smith at home and essentially screamed at her for about twenty minutes. Smith informed Manaway that

---

[1] An evaluation in January 2007 gave her a score of 323.5 out of a possible 400 points. A score of less than 250 requires that the employee be put on a performance improvement plan. An earlier evaluation on January 2006 assigned her a score of 324.8 out of 400 possible points. The Chief Nursing Officer who eventually terminated Manaway acknowledged that she was a good nurse.

[2] According to Manaway, Tiffany Guillory is African-American but is younger than her.

[3] Manaway contends that Smith began rotating the charge nurse position on other shifts only after she voiced her displeasure. According to Manaway, after the change she rarely worked as charge nurse on her shift and was replaced with younger, non African-American nurses with less experience.

she decided to rotate the position because if Manaway wanted to be off work or called in sick, Smith needed to have someone trained to fill in without using an agency nurse or without having to work the shift herself. Smith contends that she also told Manaway that she made the change because she knew there would be a time when Manaway was going to retire or otherwise leave employment and Smith need to have a succession plan in place. As a result of this change, Manaway would have to begin providing more direct patient care.

In contrast, Manaway contends that Smith took her off the schedule as charge nurse and that Smith said that did so because she understood that Manaway was retiring. In response, Manaway states that she told Smith that she was not retiring and it was only then that Smith declared that the charge nurse position would rotate. According to Manaway, after this particular conversation, Smith began to rotate the charge nurse position on other shifts as well. Manaway made it clear to Smith that she felt that she was being discriminated against because of her age.[4]

After the change, Ray Opina (Filipino, late 50's), Melody Dortejo (Filipino, 40's), Barbara Rone (Caucasian, late 50's), Josette Walston (Caucasian, almost 40), Tammy Nye (Caucasian, 40's), and Forta Mullins (African-American, late 50's, 60's) began the rotation as charge nurse. Manaway also began rotating.

According to Smith, after the schedule change she began to receive complaints from other nurses about Manaway's performance. Staff members complained that Manaway was not providing assistance when requested and was spending most of her time on the telephone. On October 31, 2007, Tiffany Guillory, an African American staff nurse, needed assistance with several patients and

---

[4] Manaway contends that in a subsequent meeting, Smith stated that she wanted new ideas and younger people. Manaway cannot remember the date of this meeting.

Manaway allegedly refused to assist when asked. According to Guillory, she asked Manaway for help and Manaway refused and told her to do it herself. Guillory eventually telephoned her sister, who was a registered nurse, at home and her sister talked Guillory through the procedure that needed to be performed on the patient. Guillory was distraught and complained to Smith. As a result of this incident and other complaints, Smith decided to remove Manaway from the charge nurse rotation on her next scheduled shift, which was set for November 2, 2007. Smith intended to address the complaints with Manaway before putting her back in the rotation.

Manaway became very upset when she came to work on November 2nd and discovered that she would not be the charge nurse that night. She telephoned Smith at home and complained in an angry manner. In response, Smith asked Manaway to schedule an appointment to meet with her the following Monday. According to Smith, Manaway stated that she was not going to "make an appointment for nothing."[5] Manaway then hung up.

The Medical Center maintains an "Alertline" at its corporate headquarters to help identify and address employee concerns in the workplace. On November 2, 2007, Manaway called the Alertline and complained that Smith had not given her advance notice of the schedule change wherein she was removed as charge nurse. Manaway alleged that company policy may have been violated but, according to the Medical Center, she did not specifically claim that the change was made by Smith due to Manaway's age or race.[6]

On November 5, 2007, Manaway made a follow-up call to the Alertline and alleged that, in

---

[5] Manaway does not remember making this statement.

[6] Manaway states in her affidavit that she complained that she was removed from the charge nurse position because of her race. A review of the Alertline Confidential Memorandum does not reflect that Manaway complained about being removed from the charge nurse position on the basis of age or race. The notes indicate that Manaway complained about not getting advance notice about the change in the schedule.

February 2007, Smith told a staff nurse named Angela Harris that she was going to send the Klu Klux Klan to Harris' house. According to Manaway, she heard about this incident from other employees who had heard the comment made by Smith and also heard about the incident from Harris. Manaway could not remember the names of these employees and she did not report this incident when she first heard about it because she thought others did. According to Manaway, a physician named Dr. Patel also overheard the comment and reported it to administration but nothing was done. Manaway also complained that white employees were paid at a higher rate than African-American employees but could not provide any details.

Jennifer Barroeta, the Medical Center's Director of Human Resources, conducted an investigation as to whether Smith had the authority to implement the schedule change and as to whether the failure to give Manaway and others advance notice was improper. Barroeta determined that Smith had the authority to change work schedules based on patient census and department needs and that advance notice of schedule changes was not always possible. She further determined that advance notice of schedule changes was not required by company policy.

Barroeta took Manaway's claim about the comment made by Smith very seriously and questioned Smith. Smith firmly denied making any such comment to Harris. When Barroeta questioned Harris, Harris stated that the comment by Smith had to have been made in February 2006. However, Barroeta knew that this could not be the case since Smith was not employed at the facility in 2006. Barroeta then attempted to contact Dr. Patel to determine what he knew about the incident, however, he failed to return Barroeta's telephone calls. Barroeta then spoke with Sylvia Roberts, the former Chief Nursing Officer at the facility, who would be the likely recipient of any such complaint made by Dr. Patel. Roberts indicated that she had spoken with Dr. Patel in the past

on several occasions but did not recall receiving any such report. Roberts further stated that she had spoken with Manaway during the summer of 2007 and Manaway never mentioned any such comment made by Smith. Therefore, Barroeta could not confirm whether Smith actually made the comment. However, because of the serious nature of the allegation, Heidi Wolf, the Medical Center's Chief Nursing Officer, met with Smith and counseled her about her leadership role and the Medical Center's expectations as they relate to improper comments.

Barroeta also investigated Manaway's allegation that white employees were being paid at a higher rate than African-American employees. When asked about this allegation, Manaway complained that less experienced co-workers had a rate of pay which was close to hers. Barroeta explained to Manaway that, because of her experience, she was earning the maximum rate of pay for a registered nurse and it was possible that less experienced employees could be making only slightly less than her.

Manaway also made a complaint about being assigned charge nurse duties when a co-worker (a white nurse) called in sick on November 3, 2007. Manaway felt that she this was discriminatory since she was replaced by the white nurse on November 2nd as charge nurse and then was forced to assume the duties of a charge nurse on November 3rd when that nurse called in sick.

A meeting was held on November 8, 2007 concerning the incident on November 2nd where Manaway hung up on Smith. Smith, Barroeta, Wolf and Manaway were all in attendance. During the meeting, Smith apologized to Manaway for abruptly changing the schedule and removing her from acting as charge nurse without first notifying her. However, it was made clear to Manaway that her actions were unacceptable and she was given a written performance counseling record for hanging up on her supervisor, which is in violation of the Medical Center's customer service policy.

It appears that Manaway refused to sign the counseling record.

On November 16, 2007, Manaway did not appear for work and she received a verbal warning for this absence in conjunction with her previous accumulated absences.[7]

Manaway called the Alertline again on November 29, 2007 and made two complaints. She initially complained that she had been counseled for excessive absenteeism and that this was actually harassment for making a previous complaint on the Alertline. After investigation, Barroeta determined that thirteen other employees had also been counseled about absenteeism since June 2007 and that Smith had applied the Medical Center's policy evenly to all employees.

Manaway received her annual performance rating from Smith on December 22, 2007.[8] The evaluation appears to be satisfactory, with a total evaluation of 309.5 out of a possible maximum score of 400. However, the evaluation contained the following comment: "Sue has had some recent complaints on the way she handles issues. She has also had some recent patient complaints - these were discussed with her on 9/11/2007." Manaway refused to sign the evaluation and returned an unsigned copy with her handwritten comments on "Post It" notes stuck to the evaluation. Manaway indicated in one of the comments that she would sign the performance evaluation when her concerns were addressed.

On January 10, 2008, the charge nurse on duty (Rey Opina) requested that Manaway take an assignment with a newly admitted patient and Manaway responded that she "had her hands full."[9].

---

[7] Manaway contends that this was a "bogus" warning.

[8] According to Smith, she had previously asked Barroeta to review the performance evaluation and expressed a desire to make certain that the evaluation was fair.

[9] The memo dated January 10, 2008 written by the charge nurse alleged that Manaaway stated "I'm not gonna take a patient right now." Manaway insists that she did not refuse to take responsibility for the new patient, she merely told the charge nurse that she was busy with other patients.

Another staff nurse, Tiffany Guillory, called Smith at home to complain about Manaway's refusal.[10] On January 16, 2008, a meeting was held to address this particular issue. According to Smith, Manaway refused to accept responsibility and attempted to justify her refusal to accept responsibility for the newly admitted patient. Smith concluded that it was undisputed that Manaway had refused to take the patient assignment but did not fully understand the nature of the meeting. However, Manaway assured Smith that there would not be a problem in the future and Smith did not present a written reprimand to Manaway at that time.

On January 23, 2008, Tiffany Guillory contacted Smith and asked to be assigned two particular patients because she had cared for them previously. The schedule initially reflected that these two patients were assigned to Manaway. The patients themselves also indicated a desire to be attended to by Guillory.[11] Smith instructed Deborah Vanover, the charge nurse on duty, to change the schedule to reflect the transfer of patients. Manaway allegedly became upset because she would have to "walk" two patient halls instead of one and refused to accept the schedule change.[12] The patients were not reassigned.

A meeting was held on January 28, 2008, to discuss this particular issue. Manaway, Smith and Barroeta were present. Manaway was upset and insinuated that Smith was lying when she said that the patients themselves had requested the change. Manaway also accused Smith of "tearing this

---

[10] Again, Guillory is African-American.

[11] Manaway contends that this alleged fact was "concocted" by Smith and Jennifer Barroeta.

[12] Manaway testified in her deposition that Guillory wanted to make the change because she herself did not want to "walk" two halls. In her affidavit in opposition to the summary judgment, she states that she never refused the patient assignment. She states that she simply complained that she was busy herself with her patients and the patents of another nurse. Manaway notes that white nurses would lose their temper and fail to take orders and were not fired.

unit apart" and requested to see Mr. Landry.[13]  Manaway stated, "I want to see Mr. Landry because I'm tired of the two of you."  Barroeta told Manaway  that she was welcome to visit with Landry but they needed to finish this conference.  Manaway then walked out of the room.  Smith and Barroeta had prepared a final written warning for Manaway regarding her refusal to accept the patient assignment but she had abruptly walked out of the meeting before they had a chance to present it to her.  Barroeta sent Manaway a copy by certified mail.[14]   Manaway did not meet with Landry, but instead spoke with Heidi Wolf, the Medical Center's Chief Nursing Officer.

On February 9, 2008, Manaway was asked to perform an assessment on a new patient.  She allegedly refused and stated that the day shift nurses should have completed those tasks.[15]  The day shift charge nurse on duty drafted a memorandum regarding this incident and sent it to the hospital administration.

Manaway then met with Wolf on February 15, 2008 to complain about several issues.  Manaway complained that she was aware that another employee was rehired and did not have to go through orientation.  Manaway further complained that a mother and daughter were working on the same unit and this, according to Manaway, was improper.  She also complained about the manner in which a co-worker's absences were counted with regard to worker's compensation.  Finally, she complained that other employees were "tattling" on her.[16]     It was determined that, under company policy, an employee is not required to go through orientation if rehired within one year.  It was also

---

[13]  Michael Landry is CEO of the Medical Center.

[14]  Manaway claims that she never received this document.

[15]  Manaway does not remember this incident and denies that it happened.

[16]  None of these complaints appeared to involve unlawful discrimination.

determined that a mother and daughter did indeed work on the same unit but this did not violate corporate policy since one did not occupy a supervisory role over the other. Wolf stated that she could not discuss another employee's absences with Manaway. Finally, regarding the tattling complaint, Wolf told Manaway that each employee had the right to discuss their concerns with Smith, just as Manaway had done in the past.

As a result of Manaway's alleged refusal to accept a new patient on February 9, 2008, Smith recommended to Wolf that she be terminated. Wolf determined that, in her opinion, Manaway's termination was appropriate and she drafted a memorandum which outlined the events which occurred involving Manaway during Wolf's tenure at the facility. After setting forth the details of Manaway's conduct and meetings and discussions that she had with Manaway, Wolf stated:

> "Sue's complaints regarding Ms. Smith's management style and the inability to communicate with her lead me to believe that it would be nearly impossible to have an amicable resolution to many of the issues which have been raised up to this point.
>
> I have also reviewed the rebuttal statements Sue submitted to Human Resources. The concerns which Sue addressed in her rebuttal statements regarding absenteeism, discrimination, and harassment have been reviewed In reference to the hospital attendance policy, any absences that occur without prior request and approval for time off are considered unscheduled absences, regardless of whether the absence is re-booked immediately or at a later date. Patient assignments are made based on acuity and skill mix. Assignment sheets along with acuity guide and duty assignments will be placed on the unit this week in order to assist the charge nurse in making the best assignments possible in the interests of our patients. *Sue has made several other allegations of discrimination over the past few months, all of which have been investigated either at the hospital level, or at the corporate level and were found to be unsubstantiated.* Although every employee is highly valued to me and The Medical Center of Southeast Texas, it is becoming more evident that we may not be able to reach a resolution which is amicable to all of the parties involved. As such, I have decided to separate the employment relationship at this time."

(Emphasis added). It was Wolf's decision to terminate Manaway, it being "a collective decision involving a lot of different documentation that we had and a continuing problem with Ms.

-10-

Manaway not accepting direction from other charge nurses." According to Wolf, neither race, age, nor Manaway's allegations of discrimination were factor in her discharge. During her deposition, Wolf did not recall why she chose to reference Manaway's allegations of discrimination as a reason why it would not be possible to reach an amicable solution.

Barroeta discussed Manaway's performance issues with Russ Follis, the Corporate Director of Human Resources. The two discussed her insubordination and her pattern of responding to counseling by raising irrelevant complaints on the Alertline. Follis then approved the termination.

On April 30, 2009, Manaway filed her Plaintiff's Original Complaint. [Clerk's doc. #1] commencing this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"), and 42 U.S.C. § 1981, which in relevant part prohibit discrimination in employment based on an employee's race and/or retaliation based upon opposition to race discrimination. She also brings suit under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.,* commonly referred to as the ADEA, which prohibits employment discrimination based on age. Specifically, Manaway alleges that: she was replaced as charge nurse by a younger, white employee with less experience; she unfairly received performance counseling records for inquiring about the re-assignment; for absenteeism, and for allegedly refusing a patient assignment; and African-American employees are subjected to different terms and conditions of employment than white employees, including the receipt of lower pay. She alleges that she was ultimately terminated as a result of her race, age, and her opposition to race discrimination.

The Medical Center argues that Manaway has made a litany of grievances, but few arguably come within the ambit of Title VII or Section 1981. The Medical Center contends that any claims which do come under Title VII or Section 1981 have no evidence to support them. First, the Medical

Center argues that Smith had the right to rotate the charge nurse position and no unlawful discrimination occurred. Secondly, the Medical Center contends that it throughly investigated the allegation that Smith made the comment about the KKK and was not able to confirm that the comment was made. Further, they argue that, out of an abundance of caution, Wolf counseled Smith about the Medical Center's expectations about inappropriate comments. Third, the Medical Center contends that there is no evidence to show that Manaway was unfairly compensated because of her race.

Manaway contends that she did not abuse the attendance policy and, further, she never refused a patient assignment. As stated above, Manaway argues that she was terminated because of her race, her age, and because she complained about discrimination at the hospital.

### **Summary Judgment Standard**

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C). This rule places the initial burden on the moving party to identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (Quoting Rule 56(c)); *Stults v. Conoco, Inc.,* 76 F.3d 651, 655-56 (5th Cir. 1996) (Citations omitted). The movant's burden is only to point out the absence of evidence supporting the non-movant's case. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992). When the moving party has carried its burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party bears the burden of coming forward with "specific facts showing that there is a genuine issue for trial." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 91 L.Ed.2d 202 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* Thus, the nonmoving party must present specific facts showing that there is a genuine issue for trial. *Id.* at 248-49 (Citing Rule 56(e)). To defeat summary judgment of his hostile work environment sexual harassment claim, Plaintiff must establish that a genuine issue of material fact exists as to each element of his claim. *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046 (5th Cir. 1996).

**Manaway's Burden in Proving Unlawful Discrimination Because of Race**

Under the modified *McDonnell Douglas* [17] framework, the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or, (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007).

**Manaway did not establish prima facie case of race discrimination**

In order to establish a prima facie case of discrimination, Plaintiff must show that she: (1) is a member of a protected class; (2) is qualified for the position; (3) suffered an adverse employment

---

[17] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, that others "similarly situated" were treated more favorably.[18] *Id.*

There is little doubt that Manaway is a member of a protected class, was qualified for the charge nurse and/or staff nurse position, and suffered an adverse employment action by being terminated. The Court now looks for competent evidence to establish that she was replaced by someone outside the protected class, or in the case of disparate treatment, that others "similarly situated" were treated more favorably. *Burrell*, at 411-12.

There is no evidence in the record to show that anyone permanently replaced Manaway as charge nurse after she was discharged. The Medical Center correctly points out that Manaway was discharged in February 2008 and she has produced no evidence that she was replaced by someone outside of the protected class. Further, there is little evidence to show that she was replaced by someone outside the protected class after her demotion and before her termination. The record reflects that after the schedule change, Ray Opina (Filipino, late 50's), Melody Dortejo (Filipino, 40's), Barbara Rone (Caucasian, late 50's), Josette Walston (Caucasian, almost 40), Tammy Nye (Caucasian, 40's), and Forta Mullins (African American, late 50's, 60's) began the rotation as charge nurse. Manaway also began rotating. It should be noted that a review of Manaway's Complaint appears to show that she is claiming wrongful termination as the adverse employment action and not the demotion from being a charge nurse. However, were that not the case, this Court would find that she not "replaced" in the position of charge nurse by persons outside the class because she remained in the rotation and other nurses, both African-American, and nurses of similar age performed that

---

[18] "When Section 1981and Title VII are alleged as parallel bases of relief, the same elements of proof are required for both actions." *Flanagan v. Aaron E. Henry Community Health Services Ctr.,* 876 F.2d 1231, 1233-34 (5th Cir. 1989).

duty. Further, it appears that the position of permanent charge nurse was eliminated and that duty was distributed among the staff nurses. Therefore, she was not "replaced" as a charge nurse. *See*, *e.g., Dulin v. Dover Elevator Co.*, 139 F.3d 898 (5th Cir. 1998)(affirming the district court's holding that "when an employee's position has been eliminated and the job duties reassigned to existing employees, that employee was not been replaced").

Manaway seems to agree and responds that while she "may or may not have been replaced by an employee who was not of the protected class, Supervisor Smith has never recommended termination for a younger, white employee who was not diverting narcotics or failing to report to work." Therefore, the Court finds that there is no evidence in the record that Manaway was replaced by someone outside of the protected class.

The Court now looks at the summary judgment evidence presented as to whether others "similarly situated" were treated more favorably. The Medical Center contends that there is no evidence of record which shows that other "nearly identical, similarly situated" nurses refused to take patient assignments and Manaway's conclusory allegations are insufficient to establish comparator evidence for the purposes of stating a prima facie case of discrimination. Specifically, they argue that Manaway's unsubstantiated allegations regarding the treatment of nurses Marva Roan and Debra Vanover do not constitute competent summary judgment evidence. The Medical Center asserts that there is no evidence that Manaway's unsubstantiated allegation that Roan yelled and screamed at individuals was reported to management. Likewise, it argues that Manaway's complaint that Vanover should have been fired for reading novels at work and not taking orders is conclusory. The Medical Center contends that there is no evidence that either nurse refused to accept a patient assignment from a charge nurse.

In her response on this point, Manaway makes the conclusory assertion that Smith never recommended termination for a younger, white employee who was not diverting narcotics or failing to report to work. The Court, and it appears the Medical Center, assume that Manaway is asserting that the "similarly situated" employees are Marva Roan and Debra Vanover. In the factual background of her response to the motion for summary judgment, Manaway complains that Roan "would scream and get in peoples' faces" and Vanover would "read novels and work crossword puzzles'" and fail to take orders. Manaway complains that these two nurses were not terminated, and this constitutes disparate treatment.

In order to show disparate treatment, Manaway must show that the misconduct for which she was discharged was nearly identical to that engaged in by an employee not within her protected class whom the hospital retained. See *Wallace v. Methodist Hospital Sys.,* 271 F.3d 212, 221 (5th Cir. 2001); *cert. denied* 535 U.S. 1078 (2002). "[T]he conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Id.*

The "nearly identical misconduct" requirement was recently illustrated in *Knatt v. Hospital Serv. Dist. No. 1 of E. Baton Rouge Parish*, No. 07-31027, 327 F. App'x 472 (5th Cir. May 12, 2009). In *Knatt,* an African–American doctor who was suspended for being impaired in the operating room produced evidence of five white doctors whom he alleged were more favorably treated. *Id.* These physicians were not suspended even though they stole drugs, performed operations incorrectly, and failed to show up for work. *Id.* at 482-83. The Fifth Circuit Court of Appeals held that the plaintiff had not specifically identified a case where a white doctor was impaired in the operating room and was not suspended. *Id.* at 483. The Fifth Circuit held that the plaintiff failed to establish a prima

facie case of disparate treatment and saw no need for any further inquiry under the *McDonnell Douglas* framework. *Id.*

Manaway alleged that Marva Roan (a white nurse) screamed at co-workers and "fussed" at her supervisors and never was terminated. *Manaway depo,* pp. 161-162.. Manaway states that other employees reported Roan's actions to management. She further alleges that Debra Vanover (another white nurse) was not terminated even though she read novels at the nurse's station, worked crossword puzzles, chatted on the telephone, did not take orders, and did not perform her duties in a timely manner. *Manaway depo,* pp. 161-162. However, there is no indication that Vanover's actions were ever reported to management. This Court finds that Roan is not a similarly situated employee. There is no evidence that she possibly jeopardized patient care by refusing to take patient assignments. Likewise, Vanover is not a similarly situated employee. Although there is a general allegation that she did not take orders, this Court cannot determine the context of any such order. Further, there is no evidence presented by Manaway that any failure of Vanover to take orders was communicated to management. *See James v. Fiesta Food Mart, Inc.,* No. 10-10107, 2010 U.S. App. LEXIS 18160, 2010 WL 3377625 at *3 (5th Cir. Aug. 27, 2010 )(plaintiff failed to show co-workers outside protected class received preferential treatment because he could not produce evidence to show that any relevant management officials knew about the co-workers' wrongful acts).[19] Further, there is no competent summary judgment evidence that either nurse abruptly walked out of meetings held to address their disciplinary problem or otherwise displayed a continuous, long-term pattern of

---

[19] Manaway, in her affidavit, states that "[y]ounger and non-African-American employees who complained of their patient assignments and even called Supervisor Smith at home were not similarly terminated." Manaway was terminated for refusing to accept patient assignments, not for merely complaining about the assignments. Further, this statement does not set forth similarly situated employees for purposes of the prima facie case. *James, Id.* (plaintiff's description of co-workers who received preferential treatment as Hispanic without identification of any particular person is insufficient).

insubordination to their immediate supervisor and human resource personnel. Therefore, Roan and Vanover are not "similarly situated" and this Court holds that Manaway has not established a prima facie case.

### Assuming, *arguendo,* that Manaway set forth a *prima facie* case, the Medical Center has produced a non-discriminatory reason for her termination.

Even if Manaway has indeed set forth a prima facie case, the Medical Center has provided a non-discriminatory reason for her termination, that is, her failure to accept patient assignments from other charge nurses. A subordinate's failure to follow a supervisor's direct order is a legitimate non-retaliatory reason for discharge. *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 167-68 (5th Cir. 1999).

### Manaway has not shown "pretext" or "mixed motives".

Manaway could still prevail if she can demonstrate that the proffered reason was a pretext for the discriminatory motive, *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2001), or if the employer has "mixed motives" for the adverse action, one of which was discriminatory, *Smith v. Xerox Corp.*, 602 F.3d 320, 328-30 (5th Cir. 2010)(holding that a plaintiff may establish a Title VII cause of action through a "mixed motive" analysis, but such an analysis is improper under the ADEA, where the plaintiff "retains the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action). Pretext may be established either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. *Laxton v. Gap, Inc.,* 333 F.3d 572, 578 (5th Cir. 2003). An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *Id.*

Manaway argues that her termination for failing to accept patient assignments is pretextual

in that she "has provided substantial evidence that she never failed to take any such patient assignment." *Manaway Brief,* p. 16. She asserts that she did nothing but engage in permissible discussion about the assignments made. *Id.*

This Court must again review the three instances where Manaway allegedly refused to take a patient assignment. Again, the first incident occurred on January 10, 2008. On that particular day, the charge nurse on duty requested that Manaway take an assignment with a newly admitted patient and she allegedly responded that she "had her hands full." Manaway states that she did not actually refuse, but merely stated that she was busy with other patients. As stated earlier, a memorandum dated that same day which was submitted be the charge nurse who requested that Manaway take the patient wrote that Manaway said "I'm not gonna take a patient right now." Another staff nurse, Tiffany Guillory (an African-American nurse) called Smith at home to complain about Manaway's refusal.

The second incident occurred a few days later on January 23, 2008. This is the incident wherein two patients who allegedly wanted to be attended to by Guillory were taken off Manaway's schedule and assigned to Guillory. Smith instructed the charge nurse to make the change and Manaway allegedly refused to accept it. Because she would have to walk two patient halls. Again, Manaway says in essence that she never refused to accept the patients but only complained about being busy with other patients.

Finally, the third incident allegedly occurred on February 9, 2008 when Manaway was asked to perform an assessment on a new patient. She allegedly refused and stated that the day shift nurses should have completed those tasks. Manaway does not remember this incident.

The record reflects that, on repeated occasions, Manaway was ordered by the charge nurse

to accept patients and, at best and in the light most favorable to her, she complained and objected so that the patients were not transferred to her care.

This Court cannot second-guess the Medical Center's decision to terminate Manaway for insubordination for repeatedly objecting and failing to accept new patients when ordered to do so by her employer. *Cf. Johnson v. Merrill Dow Pharms., Inc.,* 965 F.2d 31, 35 (5th Cir. 1992)(stating that the employer must maintain the ability to "supervise, review, criticize, demote, transfer, and discipline employees). Manaway's objections and complaints about being assigned new patients simply amounts to a refusal. Furthermore, the record also reflects that on several occasions it was an African-American nurse (Tiffany Guillory) who complained to management that Manaway either refused to assist other nurses or accept new patients. In addition, the record reflects that Manaway was insubordinate to her supervisors by abruptly walking out of the room when they attempted to counsel her regarding these issues. She has not shown that similarly situated employees were treated differently or that the employer's preferred explanation is false or unworthy of credence. Based on the evidence, the Medical Center's reason to terminate Manaway was legitimate and non-discriminatory.

### The ADEA Claim

For Manaway to establish a *prima facie* case in an age discrimination claim based on disparate treatment she must establish: (1) that she belongs to a protected group of persons over the age of forty; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; and (4) that others similarly situated but outside the protected group received more favorable treatment. See *Willis v. Coca Cola Enters., Inc.,* 445 F.3d 413, 420 (5th Cir. 2006); *Rutherford v. Harris County Tex.,* 197 F.3d 173, 184 (5th Cir. 1999).

If she is able to set forth a *prima facie* case, the burden of production then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for its actions. See *Shackelford v. DeLoitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir. 1999). If the employee meets this burden of production, the presumption of discrimination created by the prima facie case drops out of the picture and the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" was the plaintiff's protected characteristic (mixed motive). *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004). If the plaintiff demonstrates that age was a motivating factor in the employment decision, then it falls to the defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, plaintiff prevails. *Id.*

Again, for the reasons set forth above, Manaway fails to establish the fourth element of her prima facie case. There is no competent summary judgment evidence showing that others outside of her age group who insubordinately refused to accept patient assignments were not terminated. Even if she could establish a prima facie case, as stated above, the Medical Center had a legitimate, non-discriminatory reason for terminating her. Manaway has not shown pretext or that another motivating factor was her age. Any remarks made by Smith as to whether Manaway was retiring is not by itself indicative of discriminatory intent. *See Moore v. Eli Lilly & Co.,* 990 F.2d 812, 818 (5th Cir.), *cert. denied* 510 U.S. 976 (1993). (holding that an employer's inquiry into an employee's age and retirement plans is not by itself evidence of discriminatory intent). No remark allegedly made by Smith would make one conclude that Manaway's age was a determinative factor in her

termination.  Further, it does not appear that Smith had any involvement in the ultimate decision to terminate Manaway.  That decision was made by Barroeta, Wolf, and Follis.

**Retaliation**

Retaliation claims are analyzed under the same *McDonnell Douglas* framework.  *Medina v. Ramsey Steel Co.,* 238 F.3d 674, 684 (5th Cir. 2001).  Under Title VII, a prima facie case of unlawful retaliation includes that: (1) the plaintiff engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  *See Raggs v. Miss. Power & Light Co.,* 278 F.3d 463, 471 (5th Cir. 2002)(citing *Evans v. City of Houston,* 246 F.3d 344, 352 (5th Cir. 2001)).  The causal link does not rise to the level of a "but for" standard.  *Raggs*, 278 F.3d at 471.  In other words, the plaintiff does not have to prove that her protected activity was the sole factor motivating the employer's challenged decision to establish the causal link element.  *See Gee v. Principi,* 289 F.3d 342, 345 (5th Cir. 2002).  A "causal link" arises where "the employer's decision to terminate was based in part on knowledge of the employee's protected activity."  *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir. 1998).  The mere fact that some adverse action is taken after an employee engages in some protected activity does not permit EEOC complainants to disregard work rules or job requirements.  *Raggs,* 278 F.3d at 471.

Once the plaintiff establishes a prima facie case of retaliation, the employer must produce a legitimate, non-discriminatory reason for the adverse  employment decision.  *McCoy v. City of Shreveport,* 492 F.3d 551, 556 (5th Cir. 2007).  The burden of the employer is one of production, not persuasion, and does not involve a credibility assessment.  *Id.*

The burden then shifts back to the plaintiff to show either: (1) that the employer's reason is

not true, but instead a pretext for retaliation (pretext alternative); or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected activity (mixed motive alternative). *Rachid,* 376 F.3d at 312. Under the pretext alternative, the plaintiff bears the ultimate burden of proving that the employer's proffered reason is not true but is instead a pretext for the real retaliatory purpose. To carry this burden, the plaintiff must rebut each nonretaliatory reason articulated by the employer. *McCoy,* 492 F.3d at 556. Under the mixed motive theory, if the plaintiff shows that her protected activity was a motivating factor, then the burden shifts back to the employer to show that the adverse employment decision would have been made regardless of the retaliatory animus. *Rachid,* 376 F.3d at 312.

The Medical Center, of course, acknowledges an adverse employment action and the fact that Manaway made several complaints of discriminatory conduct. However, the Medical Center argues that there is no evidence establishing a causal connection between the protected conduct and her termination. Specifically, the Medical Center asserts that Wolf's mention of Plaintiff's discriminatory complaints in the termination memorandum does not itself establish a causal link because knowledge of protected conduct when making the termination decision does not create a genuine issue of material fact in support or a retaliation claim, citing *Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999) and *Bartz v. Mitchell Center,* 2008 WL 577388, at *3.

In *Seaman,* the employee screamed at the employer over the telephone and was fired for insubordination. *Id.* at 301. The employee had also mentioned his EEOC complaint just moments before the termination. The Fifth Circuit held that this did not, absent other evidence, prove that the termination was retaliatory. *Id.* In doing so, the Fifth Circuit reasoned in that an employee should not be merely mention his complaint of discriminatory conduct and then use that as a shield against

punishment for insubordinate conduct.  *Id.* at 301-302.  This Court finds *Seaman* to be factually

distinguishable.  Plaintiff did not mention her claims of discrimination during an outburst, using

them as a shield to avoid termination.  Defendant chose to mention Plaintiff's complaints in the

termination memorandum.  *Seaman* is inapplicable here.[20]

However, the Medical Center also urges the Court to follow the Fifth Circuit's reasoning in

*Winchester v. Galveston Yacht Basin,* 1997 WL 367683 (5th Cir. June 10, 1997).  In *Winchester*, the

Fifth Circuit held that a reprimand letter which the plaintiff received in reference to her pay disparity

complaint indicated that "it was *not* the complaint itself that gave rise to the reprimand, rather the

*manner of complaint.*  The summary judgment evidence demonstrates that Winchester's angry

outburst and insubordinate behavior, not her complaints about alleged gender discrimination in

compensation, triggered the letter and led to her discharge." *Id.* at *3.

Likewise, the summary judgment evidence here indicates that Manaway repeatedly refused

to accept patient assignments and acted with insubordination to staff and supervisory personnel.

Wolf's memorandum, along with other evidence, reflects this behavior in a narrative form and states

that Manaway's complaints about Smith's management style and [Plaintiff's] inability to effectively

communicate with her led her to believe that it would be nearly impossible to have an amicable

resolution to the matter.  The memorandum goes on to state that each and every rebuttal statement,

concern and complaints of harassment have been reviewed, investigated, and determined to be

unsubstantiated.  Read in context, and taken in conjunction with the facts set out above, the

---

[20] This Court also finds *Bartz* to be distinguishable.  The plaintiff in *Bartz* filed a complaint with the Texas Education Agency and previously notified her employer of her intent to do so.  2008 WL 577388 (W.D.Tex.) at *2. She was fired four days later. *Id.*  The magistrate judge held that submitting the letter to the TEA is not "protected activity" for the purposes of Title VII.  *Id.* at *3.  Even if it was, the magistrate judge held that plaintiff failed to come up with any competent summary judgment evidence to rebut the employer's nondiscriminatory reasons for her termination.  *Id.*  Again, this Court finds this case to be distinguishable due to Wolf's termination memorandum.

memorandum does not link the fact that Manaway made complaints with her ultimate termination. This Court agrees with the Medical Center hat the fact that Wolf acknowledged Plaintiff's protected conduct in the memorandum does not create an issue of material fact with respect to her retaliation claim.

**Conclusion**

Accordingly, for the reasons stated herein, the Court concludes that no issue of material fact exists on the plaintiff's claims pursuant to Title VII and the ADEA. The Court therefore finds the Medical Center's motion for summary judgment to be meritorious, as previously granted in this Court's order [Clerk's doc. #39].

**SIGNED this the 3rd day of January, 2011.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE